## AFFIVDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Ryan Roskey, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant to search  (the "**Subject Premises**"), further described in Attachment A, for evidence, instrumentalities, and fruits of criminal violations of 18 U.S.C. § 924(c), firearm possession in furtherance of violent crime, and in violation of 18 U.S. Code § 1951, interference with commerce by threats or violence (Hobbs Act Armed Robbery), and 18 U.S.C. § 2, aiding and abetting, and 18 U.S.C. § 371 conspiracy to commit the same offenses (Subject Offenses), further described in Attachment B. There is probable cause to believe that TODD LAMONTE HARRIS, Jr. (TODD H.) and others known and unknown, have committed the Subject Offenses, and that fruits of crime and evidence of the Subject Offenses will be found in the **Subject Premises**.

2.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have served as such since 2019, and during that time I have investigated numerous violations of federal law. I am presently assigned to the Lansing Resident Agency of FBI Detroit Division. Prior to becoming an FBI Special Agent, I was employed as a police officer and detective for approximately 10 years. As a police detective, I was responsible for numerous types of complex criminal investigations involving child abuse, sexual assault, internet crimes against children, child sexual abuse material, drug endangered children, human trafficking, narcotics trafficking, firearms violations, gang investigations, fugitives, and violent crime. In this role, I have been assigned to the United States Marshals Violent Fugitive Task Force and the FBI Omaha Safe Streets Task Force.  I have completed hundreds of hours of specialized investigative training from the FBI,

1

Drug Enforcement Agency (DEA) and United States Department of Justice. My current duties with the FBI include the investigation of various violations of federal criminal law, including but not limited to matters involving 18 U.S.C. § 924(c), firearm possession in furtherance of violent crime, and in violation of 18 U.S. Code § 1951, interference with commerce by threats or violence (Hobbs Act Armed Robbery), and 18 U.S.C. § 2, aiding and abetting, and 18 U.S.C. § 371 conspiracy to commit the same.

3.      During the performance of my duties as a Special Agent with the FBI, I have participated with other law enforcement officers and agents in the investigation of allegations that TODD LAMONTE HARRIS, Jr. (TODD H.), date of birth (DOB) XX/XX/2001, has engaged in violations of the **Subject Offenses**.  The information contained in this continuation is based upon information provided to me by other law enforcement officers and agents who have participated in this investigation.  This continuation does not contain all the information known as a result of this investigation, but only those facts that I believe are necessary to establish probable cause for the search warrant sought.

### SUSPECT INFORMATION

4.      PASCHAL UCHENDU (PASCHAL U.) is a 25-year-old man who resides in Mason, Michigan.  PASCHAL U. worked for Empyreal Logistics since November 2021.  In this role, UCHENDU drove a cash-in-transit van also known as a money currier vehicle.  PASCHAL U.'s employment at Empyreal Logistics was terminated after February 15, 2022.

5.      STEPHEN IKECHUKWU UCHENDU is a 20-year-old man who resides in Mason, Michigan.  STEPHEN U. is the brother of PASCHAL U.

6.      TODD LAMONTE HARRIS JR. (TODD H.) is a 20-year-old man who resides in Grand Rapids, Michigan.  According to STEPHEN U., TODD H. and STEPHEN U. attended elementary school together.

### SUMMARY OF INVESTIGATION

7.      On February 15, 2022, PASCHAL UCHENDU (PACHAL U.) reported to law enforcement that while driving an Empyreal Logistics cash-in-transit van he had been intercepted and robbed by two individuals.  PASCHAL U. reported that one of the robbers possessed a rifle during the robbery.

8.      Law enforcement interviewed PASCHAL U. immediately following his report of the armed robbery. Law enforcement reviewed video surveillance footage and audio recordings from the cash-in-transit van's security system as well as other security systems along PACSHAL U.'s February 15, 2022, path of travel.  Law enforcement also interviewed Empyreal Logistics personnel regarding its policies and procedures as well as PASCHAL U.'s training.

9.      Based on the review of video surveillance footage and audio recordings from various security systems, law enforcement determined two suspect vehicles were involved in the armed robbery:  a blue Buick Rendezvous missing a rear passenger side hub cap and a white SUV.

10.      I am informed that (1) law enforcement found that PASCHAL U. violated Empyreal Logistics policies and procedures regarding stopping the cash-in-transit van during his route; (2) PASCHAL U. made a personal stop at Best Buy in Okemos, Michigan during his route and two suspect vehicles involved in the robbery arrived at the same Best Buy parking lot at or near the exact time PASCHAL U. arrived; (3) law enforcement determined multiple inconsistencies between PASCHAL U.'s statements to law enforcement regarding the details of the robbery and the video and audio footage obtained by law enforcement; (4) PASCHAL U.

admitted to law enforcement that he communicated with others using his phone around the time of the robbery, but could not recall the names of each of those individuals; and (5) PASCHAL U. agreed to participate in a polygraph examination conducted by the FBI on February 18, 2022, in which he was asked about his role, if any, in the February 15, 2022, robbery and the results of the polygraph examination were deemed conclusive and deception was indicated.

11.     During the February 18, 2022, polygraph examination pre-interview, PASCHAL U. stated he may have communicated with other individuals prior to going to Best Buy but he could not remember the names of the individuals. Video from the interior of the EL van show PASCHAL U.  manipulating his phone prior to arriving at Best Buy.  I am informed that video from the interior of Best Buy shows PASCHAL U. manipulating his phone inside the Best Buy.

12.     On February 21, 2022, at 9:07 AM, Kent County deputies recovered a blue Buick Rendezvous which had been sprayed with green spray paint in some places and appeared to have been cleaned with bleach or some other chemical cleaner.  It was missing a rear passenger side hub cap.  Deputies recovered the vehicle identification number (VIN) and interviewed the registered owner TODD LEMONTE HARRIS JR. (TODD H.).

13.     On February 21, 2022, TODD H. was interviewed and told deputies that he sold the Rendezvous on December 15, 2021.  However, the investigation has revealed that Valvoline, located at 4403 Eastern Southeast, Kentwood, Michigan, serviced the blue Buick Rendezvous registered to TODD H. on February 5, 2022, and February 15, 2022 (the day of the robbery).  Surveillance footage from Valvoline depicts a driver who bears similarities to TODD H. driving the blue Buick Rendezvous on February 5, 2022.

14.     On February 23, 2022, I spoke with TODD H. via telephone and learned that he had left the state of Michigan soon after speaking with deputies.

15.     On February 23, 2022, pursuant to a search warrant, PACHAL U.'s Apple iPhone was searched and a connection between PASCHAL U.'s, brother STEPHEN U., and TODD H. was revealed.  Specifically, STEPHEN U. sent a Snapchat chat attachment with the phone number TODD H. was using to PASCHAL U. The attachment showed it was sent "one week ago." PASCHAL U.'s phone was placed in airplane mode on February 18, 2022, and therefore not receiving a cellular signal. The attachment could have been from a week prior to February 18, 2022. A manual review of PASCHAL U.'s phone also revealed that phone calls prior to 2:00 PM on the February 15, 2022, were deleted from the call logs. Recovered call-log data revealed STEPHEN U. was in contact with PASCHAL U. shortly before the February 15, 2022, robbery which occurred just prior to 2:00 PM.

16.     On February 27, 2022, Meridian Township Police Detective Megan Klein spoke with TODD H.'s father, Todd Harris, Sr. via telephone.  In summary, Todd Harris, Sr. stated that he spoke with TODD H. and TODD H. admitted to him that he was involved in the February 15, 2022, robbery of the EL Van.

17.     On February 28, 2022, I reviewed T-Mobile Call Detail Records (CDR) from TODD H's phone number 616-427-9534. On February 15, 2022, between 12:13 PM and 1:19 PM TODD H's phone appears to travel from Grand Rapids, Michigan to a location near 1593 Haslett Road, Haslett, Michigan.  The address of 1593 Haslett Road, Haslett, Michigan is approximately 2 miles from the Best Buy where PASCHAL U. made his personal stop on February 15, 2022. During this time (12:13 PM to approximately 1:19 PM), TODD H's phone received two phone calls from STEPHEN U.

18.     On February 15, 2022, at approximately 1:55 PM, Meridian Township Police (MTPD), responded to Okemos Community Church, located at 4734 Okemos Road, Okemos,

Michigan, in reference to a reported armed robbery. The caller, PASCHAL U., advised the dispatcher that he was the driver of a cash-in-transit van and had just been robbed by two black males with rifles. PASCHAL U. advised the male suspects left in a blue Sport Utility Vehicle (SUV) and the SUV proceeded southbound on Okemos Road.

19.     Documents provided by Empyreal Logistics (EL), the owner of the cash-in-transit van, show that over $1,000,000 was taken during the robbery, including $90,000 from Capital National Bank, a Federal Deposit Insurance Corporation insured institution.

***Interview of PASCHAL U. (EL Van Driver)***

20.     MTPD Detectives and Special Agents with the FBI interviewed PASCHAL U. at 4734 Okemos Road.  PASCHAL U. provided the following information:

a.     On February 15, 2022, PASCHAL U. was working for Empyreal Logistics (EL), driving a white Ford Transit cash-in-transit van ("EL Van").  PASCHAL U's duties were similar to an armored car driver. That morning PASCHAL U. picked up his EL Van and manifest from the EL office located at 1235 Roth Drive, Lansing, Michigan. PASCHAL U. received a manifest each work morning listing various businesses, to include banks, financial, institutions and marijuana dispensaries, where he was required to stop and collect currency. The manifest listed the amount of currency PASCHAL U. was to collect at each location.

b.     PASCHAL U. finished his scheduled route and stopped at Best Buy, located at 2020 W Grand River Rd, Okemos, MI 48864. PASCHAL U. parked the van and walked into Best Buy.  Inside Best Buy, PASCHAL U. purchased a memory card for his personal camera. After the purchase, PASCHAL U. got back in the EL Van and started driving to Lansing, Michigan where the EL office is located.  While driving, PASCHAL U. diverted from his usual route, due to bridge construction on Okemos Road at the Red Cedar River.  While PASCHAL U. was driving

around the area of Okemos Road and Red Cedar River, a black male driving an older blue Buick Rendezvous repeatedly honked his horn and flashed his lights at the EL Van. PASCHAL U. thought he might have gotten into an accident with the Rendezvous, so PASCHAL U. pulled over to the side of the road.

  c.  A black male (Unsub 1) exited the Rendezvous and approached the driver's side of the EL Van. Unsub 1 told PASCHAL U. that PASCHAL U. had hit the Rendezvous. PASCHAL U. exited the EL Van and walked back to inspect the Rendezvous for damage. While PASCHAL U. inspected the Rendezvous for damage, a black male passenger (Unsub 2), left the Rendezvous and entered the passenger side of the EL Van. When PASCHAL U. returned to the van, Unsub 2 displayed an AR-15 type rifle and told PASCHAL U. to drive away. Unsub 2 directed PASCHAL U. to Okemos Community Church and directed PASCHAL U. to park in the parking lot. Unsub 1 followed the EL Van in the Rendezvous and parked behind the EL Van. Once parked, Unsub 2 directed PASCHAL U. to open the currency safe located in the rear of the EL Van. PASCHAL U. opened the safe and Unsub 1 and Unsub 2 proceeded to load the Rendezvous with the currency stored in the EL Van. Unsub 1 and Unsub 2 were both wearing masks and hooded sweatshirts with the hoods pulled up over their heads. PASCHAL U. previously owned a Ruger model AR-15 and Unsub 2 had an AR-15 similar to the one PASCHAL U. owned.

  d.  Several weeks ago, PASCHAL U. got into an automobile accident while at work. PASCHAL U. struck a traffic cone on the highway and the traffic cone deflected from PASCHAL U.'s vehicle and struck the other vehicle. PASCHAL U. pulled over to exchange information with the other driver. PASCHAL U. gave the other driver PACHAL U's information, but PASCHAL U. never received information from the other driver. PASCHAL U. was counselled

by his management for stopping the van after the accident. PASCHAL U. was told by his management to only stop in safe areas where other people were around.

> e. PASCHAL U. did not know of any friends or contacts that would have targeted him for the robbery. PASCHAL U. told two of his friends and some of his family where he worked.  PASCHAL U. believed he was targeted or surveilled at one of his pick-up locations prior to the robbery.

***Empyreal Logistics and its Vans***

21. EL is headquartered in Denver, Colorado and conducts business in several other states therefore engaging in interstate commerce. An EL Van functions similar to an armored car conducting money pick-ups from businesses and banks. EL drivers are not armed during the performance of their duties.  The EL Van PASCHAL U. was driving is a white Ford Transit van. It does not feature any markings or logos which would indicate the van's purpose or company affiliation. The EL Van was equipped with GPS monitoring, 360-degree exterior video surveillance, interior video surveillance and audio recording capability.

***Surveillance Footage from the Day of the Robbery***

22. MTPD investigators have extensively reviewed the video recordings from the EL van, the Best Buy parking lot, and other surveillance videos from PASCHAL U's reported path of travel on the day of the robbery.

23. The EL Van's security system video footage does not capture the suspect SUV following or trailing the EL Van before PASCHAL U.'s personal stop at Best Buy.

24. The video surveillance footage from Capitol National Bank, PASCHAL U.'s last scheduled stop, does not feature the suspect SUV in the area during PASCHAL U.'s schedule pickup.

25.     Best Buy video surveillance footage depicting the Best Buy parking lot reveals the following:

a.     PASCHAL U. parked the EL Van in the Best Buy parking lot.  A blue Buick Rendezvous pulled into the Best Buy parking lot shortly after PASCHAL U. parked the EL van in the lot. PASHCAL U. is walking into the Best Buy at approximately the same time the Rendezvous is parking. It is unclear where exactly the white SUV parks at in the lot.

b.     A white SUV pulled into the parking lot near the time the same time as the Rendezvous.

c.     PASCHAL U. spent approximately 12 minutes inside Best Buy before returning to the EL Van.  PASCHAL U. got inside the EL Van and drove out of the parking lot.  The Rendezvous and the white SUV exited the lot and followed the EL Van.

26.     The EL Van's security system video footage depicts the Rendezvous following the EL Van after the EL Van left the Best Buy parking lot for several minutes at a low speed around the area of Okemos Road and the Red Cedar River.

27.     The EL Van's security system audio recording captured the Rendezvous briefly sounding the horn one time prior to PASCHAL U. pulling over and being approached by Unsub 1. The EL Van's security video footage depicts the EL Van appear to slow down prior to the Rendezvous honking.

28.     The EL Van's security system audio recording captured an exchange between Unsub 1 and PASCHAL U. after PASCHAL U. pulled the EL Van over:  Unsub 1 told PASCHAL U. that PASCHAL U. hit the Rendezvous.  PACHAL U. responded that he did not hit the Rendezvous and he will get out of the van and look.

29.     The EL Van's security video footage depicted Unsub 1 at the driver's side of the EL Van.  This is a screen shot from that footage:



30.     The EL Van's security system video footage does not depict the EL Van in a position where it could have struck or been in any other type of collision with the Rendezvous at a point in time after the EL Van left the Best Buy parking lot but before the Rendezvous honked.

31.     The EL Van's security system video footage depicts Unsub 2 enter the front passenger side almost simultaneously as PASCHAL U. exited the El Van.  The EL Van's security system audio recording captured the passenger door shut.  This is a screen shot from the video footage depicting PASCHAL U. exiting the El Van and the Unsub 2 entering the El Van:



32.     The EL Van's security system video footage depicts PASCHAL U. return to the driver's side of the EL Van with Unsub 2 sitting in the passenger side seat.  Unsub 2 has the AR-15 style rifle positioned in Unsub 2's lap.  There is no magazine in the magazine well of the rifle.  The EL Van security system audio recording captured Unsub 2 instruct PASCHAL U. to get into the van and drive.  This is a screen shot from the video footage depicting Unsub 2 in the passenger seat with the AR-15 style rifle without magazine:



33.     The EL Van security system audio recording captured Unsub 2 direct PASCHAL U. to the Okemos Church parking lot.  Unsub 2 then directed PASCHAL U. to park in the middle of the open lot and open the safe in the back of the van.  The El Van security system video footage depicts the Rendezvous pull in behind the EL Van.

34.     The EL Van's security system video footage depicts a similar white SUV from the Best Buy parking lot parked in the rear of the Okemos Community Church parking lot at the time PASCHEL U. pulled into the lot.

35.     The EL Van security system video footage depicts Unsub 2 get out of the EL Van and watch PASCHAL U. at the back of the van.  Unsub 2 went to the back of the van.  Unsub 2 left the AR-15 style rifle in the van during this time.  Unsub 1 and Unsub 2 then loaded the money deposits into the Rendezvous from the EL Van.  While Unsub 1 and Unsub 2 loaded the money deposits, the white SUV left the church parking lot.  After loading the money deposits into the Rendezvous, Unsub 2 went to the front passenger seat and retrieved the AR-15 style rifle.  Unsub 1 and Unsub 2 got inside the Rendezvous and left the church parking lot.

### EL's Policies and Procedures

36.     Law enforcement agents have spoken to multiple members of EL's management about EL's policies and procedures. Based on those interviews, I am informed that PASCHAL U. violated multiple policies and procedures established by EL to protect cash-in-transit.

a.     First, EL drivers are specifically warned about bump and rob tactics in which a subject stages or attempts to stage an accident in order to distract a driver and intercept cash-in-transit vans. EL drivers are instructed to never pull over a cash-in-transit van in the manner PASCHAL U. did on February 15, 2022.

b.     Second, according to EL management, the drivers should not have individual access to the vault located in the rear of the van where the money deposits are held. The cash-in-transit vans contain two vaults or safes in the rear of the van.  One of the vaults is specifically used only for money deposits.  Money deposits are deposited via a one-way chute into this vault. The money deposit vault may be accessed with a vault

code. According to EL management, drivers should not have the code to the money deposit vault. PASCHAL U. explained in his interview with law enforcement that he had the code to access the money deposit vault and used the code to access the vault during the robbery.

c.    Third, cash-in-transit van drivers are trained to use a duress button in situations such as an armed robbery. According to EL management, there is a green button behind the steering wheel. There is no record of PASCHAL U. activating the duress button.

37.    PASCHAL U. provided 517-748-8140 as his phone number during his February 15, 2022, interview. On February 17, 2022, FBI agents contacted PASCHAL U. using that same number to arrange the polygraph examination.

38.    On February 18, 2022, PACHAL U. submitted to a polygraph examination conducted by FBI Special Agent Michael Fitzgerald at the Federal Bureau of Investigation Lansing Resident agency. conducted the polygraph. SA Fitzgerald is a certified Federal Polygraph Examiner and has been for 11 years. SA Fitzgerald has served as an FBI Special Agent for 18 years. Prior to his service as an FBI special agent, SA Fitzgerald worked as a prosecuting attorney in Cuyahoga County, Ohio for approximately 2 ½ years.

39.    During the pre-polygraph interview, PASCHAL U. told SA Fitzgerald that he called and texted individuals using his cell phone just prior to going to Best Buy. PASCHAL U. stated he communicated with his brother, **STEPHEN IKECHUKWU UCHENDU**, his girlfriend, and an individual PASCHAL U. knows by the alias of Trap Baby Pack. PASCHAL U. stated he may have communicated with other individuals prior to going to Best Buy but he could not remember the names of the individuals. Video from the interior of the EL van show PASCHAL U. manipulating his phone prior to arriving at Best Buy. I am informed that video from the interior

of Best Buy shows PASCHAL U. manipulating his cell phone inside the Best Buy. I am also aware that call-logs from PASHCAL U.'s Apple iPhone indicate he had contact with **STEPHEN IKECHUKWU UCHENDU** at the approximate time PASCHAL U. was inside of the Best Buy. PASCHAL U. also stated he is aware of the duress button on the steering wheel.  PASCHAL U. is not certain what happens if he activates the duress button but he is trained that he is supposed to push it if he is being robbed.

40.     PASCAHL U. submitted to a polygraph examination and SA Fitzgerald questioned him on his involvement, if any, in the planning of the robbery and receipt of the proceeds from the robbery.  I am advised the results of the polygraph examination were deemed conclusive and deception was indicated. SA Fitzgerald informed PASCHAL U. that he failed the polygraph examination. PASCHAL U. stated that he was being framed for the robbery and that he would like an attorney. Once PASCHAL U. asked for an attorney, agents ceased any further questioning of PASCHAL U.

41.     Before the pre-polygraph interview and polygraph examination, PASCHAL U.'s Apple iPhone was placed on the counter outside of the polygraph interview room. Agents requested permission to search PASCHAL U's Apple iPhone and PASHCAL U. refused. Agents informed PASCHAL U. that his Apple iPhone would be seized to preserve evidence and that agents would seek a warrant to search the Apple iPhone. PASHCAL U. provided a passcode for the phone and the placed was placed in airplane mode to prevent the destruction of evidence.

### *Recovery of the Blue Buick Rendezvous*

42.     On February 21, 2022, at 9:07 AM, Kent County Deputies were dispatched to 8215 Division Avenue Southwest, Grand Rapids, Michigan, for an abandoned vehicle. Upon arrival, deputies discovered a 2003 Buick Rendezvous. The vehicle was blue and grey in color and was

spray painted on the driver's side with green spray paint. The VIN tag in the front windshield was missing and the windshield glass covering the VIN was broken. The VIN tag on the driver's side door of the vehicle was also removed. Deputies noted a strong odor of bleach or cleaning chemicals coming from the Rendezvous. Deputies were able to locate a VIN number in the rear cargo hold of the vehicle. Deputies checked the VIN and found that it belonged to TODD LEMONTE HARRIS, JR. (TODD H.).

43.     On February 23, 2022, I observed the blue Buick Rendezvous which was located at Berry's & Gillikin's Towing, 3200 E Beltline Avenue Northeast Grand Rapids, MI 49525. I observed the Rendezvous to be consistent with the Rendezvous used in the EL Van Robbery. Specifically, the Rendezvous used in the robbery was missing a rear passenger side hub cap. The Rendezvous I observed at Berry's and Gillikin's Towing lot was also missing the rear passenger side hub cap and had consistent color, trim and features as the robbery Rendezvous.

***Contact with the TODD H., the Registered Owner of the Recovered Rendezvous***

44.     On February 21, 2022, deputies contacted TODD H. via telephone. TODD H. told deputies that he sold the vehicle on December 15, 2021, to an unknown male. TODD H. described the male as a light skin, black, male, 6'1", with a thin build who walked with a limp. TODD H. stated that he was approached by the male while he was walking out of the O'Reilly Auto Parts. The male offered TODD H. $1500.00 USC for the Rendezvous. TODD H. stated knew the transmission was about to die so he accepted the offer. TODD H. provided the male with the title to the Rendezvous which TODD H. kept in the glove box. TODD H. called an Uber to drive him home. TODD H. asked deputies if he could retrieve the Rendezvous from the impound lot since the Rendezvous was still in his name.  Deputies told him no because it was being processed as evidence.

45.     On February 23, 2022, FBI agents and MTPD detectives went to TODD H's address of 4764 Wolf Run Avenue, Grand Rapids, Michigan. Agents and detectives knocked on the front door of the residence and received no answer. I contacted TODD H. via telephone. TODD H. advised that he was out of town and planned to return on February 27, 2022. TODD H. agreed to meet me on February 28, 2022, at 4764 Wolf Run Avenue, Grand Rapids, Michigan at 10:00 AM. TODD H. also confirmed that his was still living at the residence.

46.     Approximately 20 minutes after the initial phone call with TODD H., TODD H. called me back and advised he was now going to be out of town until sometime in March because he had to attend a family funeral in Wisconsin. TODD H. advised that he was currently located in Atlanta, Georgia. I asked TODD H. when he left Michigan and he said something to the effect of "a while ago." I asked TODD H. to be more specific about his departure time and TODD H. stated, "two days after." I asked TODD H. if he meant two days after deputies spoke with him and TODD H. responded "yes." I confronted TODD H. with the fact that deputies spoke with him on Monday and TODD H. replied that he had actually just arrived in Atlanta and that he slept in his friend's car last night on the way to Atlanta. TODD H. said that he was getting a hotel room at the Red Roof Inn located at 637 GA-138 W, Stockbridge, GA 30281. TODD H. agreed to meet me at Red Roof Inn on February 24, 2022.

47.     On February 23, 2022, MTPD detectives went back to 4764 Wolf Run Avenue, Grand Rapids, Michigan. Detectives spoke with Lonnie Polk (Polk) who identified himself as TODD H.'s stepdad. Polk advised that TODD H. had not lived at the residence for over a year. Polk had no further information about TODD H.

48.     After speaking with Polk, detectives spoke with TODD H.'s mother Monica Sparks-Polk (Sparks-Polk). Sparks-Polk stated that she spoke with TODD H. a few days ago and

16

that she recalled TODD H. was trying to sell his vehicle back in December, but she did not have any further details about the sale. Sparks-Polk talked to TODD H.'s father, Todd Harris, Sr., on February 21, 2022. Sparks-Polk understood from that conversation that TODD H.'s father wanted TODD H. to come to Detroit, Michigan to attend a family funeral. Sparks-Polk identified ANDRE DELAFUENTE as TODD H.'s best friend.  Sparks-Polk also stated that she did not have a current address for TODD H., but she knew he lived close.

***Valvoline Surveillance Footage***

49.    On February 23, 2022, MTPD received information that the Buick Rendezvous, registered to TODD H., had been serviced at Valvoline, located at 4403 Eastern Southeast, Kentwood, Michigan, on February 5, 2022, and February 15, 2022 (the day of the robbery). Detectives spoke with employees at Valvoline and reviewed video surveillance footage from both February 5, 2022, and February 15, 2022. The video from February 5, 2022, showed a black male driving the Rendezvous. The black male stuck his head out the driver's side window of the vehicle while receiving service. Detectives observed the black male driving the Rendezvous, bared a strong resemblance to TODD H. Below to the left is a still shot from the Valvoline video surveillance footage.  Below to the right is a screen shot of a photograph of TODD H. posted to an Instagram user account believed to be associated with TODD H.




50.    The Valvoline surveillance video also showed the Rendezvous was still bearing the Michigan License Plate ENQ 9665, which is registered to TODD H. Valvoline's records documented an address of 295 Travelo Street Southeast, Grands Rapids, Michigan associated with the Rendezvous. The Valvoline service invoice listed TODD H. as the registered owner. According to Google Maps, 295 Travelo Street is approximately 4.9 miles from 8215 Division Avenue South where the Rendezvous was discovered.

***STEPHEN IKECHUKWU UCHENDU 's Connection to Todd Harris.***

51.    On February 23, 2022, MTPD Detectives reviewed publicly available information for the "certified_tjjay" the username for a publicly available Instagram account. Detectives observed multiple photos of TODD H. on the account. Detectives also noted that one comment to a post made by "certified_tjjay" stated "I see you Mr.Harris."  Detectives noted that the Instagram account "certified tjjay" is being followed by "susu.ent" a username for a publicly available

Instagram account.  This profile picture for the username "susu.ent" is a photograph of **STEPHEN IKECHUKWU UCHENDU.**

52.     On February 23, 2022, FBI agents obtained a Kentwood Police Report regarding **STEPHEN IKECHUKWU UCHENDU** and TODD H. The report stated that on March 24, 2020, at 7:00 AM, Kentwood Police Department Officers made contact with **STEPHEN IKECHUKWU UCHENDU**, TODD H., and a third individual found asleep inside of a car in Kentwood, Michigan.

53.     On February 23, 2022, I obtained a search warrant for the Apple iPhone seized from PASCHAL U. on February 18, 2022.  During the search of the Apple iPhone, agents discovered a Snapchat chat attachment from **STEPHEN IKECHUKWU UCHENDU** via telephone number 517-315-9574 .  The attachment contained the same telephone number I used to contact TODD H. on February 23, 2022.



***Contact with Tyler Harris, Todd Harris' Brother***

54.     On February 25, 2022, MTPD Detective Megan Klein and I interviewed TODD H.'s brother, TYLER HARRIS (TYLER H.), at Fort Benning, Georgia.  TYLER H. stated that he

spoke with TODD H., on Facetime, approximately three days before the interview.  During the Facetime call, TODD H. advised that if TYLER H. needed money, TODD H. would provide money to TYLER H.  In the Facetime video, TODD H. was bragging about buying new clothes and showing money to TYLER H.  TYLER H. estimated that TODD H. had $8000.00 USD in front of TODD H. during the Facetime video.  TYLER H. knew it was $8,000.00 USD because there were eight piles of money in front of TODD H.  Each pile of money was $1,000.00 USD in $20.00 bills.  TODD H. told TYLER H. that TODD H. was moving to Florida with some friends. TYLER H. identified **STEPHEN IKECHUKWU UCHENDU** as TODD H.'s best friend. TYLER H. said that TODD H. lived with ANDRE DELAFUENTE.  A still shot of the Facetime video with TODD H. is pictured below:



55.    During the same interview, TYLER H. was shown a still photograph of Unsub 1 from the EL Van security video. TYLER H. said that Unsub 1 looked like TODD H.  We also showed TYLER H. the February 5, 2022, surveillance video from Valvoline.  TYLER H. said that the driver of the blue SUV, in the video, was TODD H.  TYLER H. stated he came home to Michigan on December 19, 2021, and estimated he saw TODD H. on December 20, 2021. When

TYLER H. saw TODD H., TODD H. was in TODD H.'s dark blue SUV. TYLER H. thought the SUV was a Pontiac SUV. TYLER H. said the Buick Rendezvous in the videos was consistent with how he remembered TODD H.'s dark blue SUV.

***Contact with STEPHEN IKECHUKWU UCHENDU***

56.     On February 25, 2022, **STEPHEN IKECHUKWU UCHENDU** was interviewed by an FBI Agent and MTPD Detective at the Bigby Coffee Shop, located at 661 North Cedar Street, Lansing, Michigan. The agent and detective used phone number 517-315-9574 to contact **STEPHEN IKECHUKWU UCHENDU**   During the interview, **STEPHEN IKECHUKWU UCHENDU** stated he attended elementary school with TODD H.  **STEPHEN IKECHUKWU UCHENDU** stated he still spoke with TODD H. one or two times per month; the last time being a few weeks ago.  **STEPHEN IKECHUKWU UCHENDU** stated the last time he saw TODD H. in person was at **STEPHEN IKECHUKWU UCHENDU**'s birthday party in the summer of 2001.

***T-Mobile Call Detail Records for TODD H.***

57.     On February 28, 2022, I reviewed T-Mobile Call Detail Records (CDR) for TODD H.'s phone number 616-427-9534.  On February 15, 2022, at 12:13 PM, TODD H.'s phone appears to be in Grand Rapids, Michigan. At 12:55 PM, TODD H.'s phone appears to be in the area of Eagle, Michigan travelling toward Lansing, Michigan. At 1:06 PM, TODD H.'s phone receives an incoming call from STEPHEN U.  At 1:06 PM, TODD H.'s phone is connected to a cellular tower located at 1193 E. Clark Road, Lansing, Michigan.  At 1:19 PM, TODD H.'s phone receives a second phone call from STEPHEN U.  At 1:19 PM, TODD H.'s phone is connected to a tower located at 1593 Haslett Road, Haslett, Michigan.  The map below depicts the address 1593 Haslett Road. The Best Buy located at 2020 Grand River Avenue is circled in the bottom left of the map.



58.     The below maps depict TODD H.'s cellphone activity (Target Phone 1 **616-427-9534) on February 15, 2022,** the day of the armed robbery.  The blue house icon indicates the address 839 South Ottillia Street Southeast.

- 2/15/2022 @ 09:15:18 EST- Incoming call from 16169354436
  - Duration- 10 seconds
  - Tower location Address -1615 Eastern Ave. SE, Grand Rapids, MI 49507



- 2/15/2022 @ 09:15:24 EST- Outgoing call to 14699829999
  - Duration- 10 seconds
  - Tower location Address -1615 Eastern Ave. SE, Grand Rapids, MI 49507



- 2/15/2022 @ 09:24:22 EST- Incoming call from 16163014000
  - Duration- 62 seconds
  - Tower location Address -1615 Eastern Ave. SE, Grand Rapids, MI 49507



- 2/15/2022 @ 10:12:58 EST- Incoming call from 17349771662
  - Duration- 11 seconds
  - Tower location Address -1615 Eastern Ave. SE, Grand Rapids, MI 49507



- 2/15/2022 @ 10:13:01 EST- Outgoing call to 14699829999
  - Duration- 11 seconds
  - Tower location Address -1615 Eastern Ave. SE, Grand Rapids, MI 49507



- 2/15/2022 @ 10:39:27 EST- Incoming call from 16165372414
  - Duration- 11 seconds
  - Tower location Address -1615 Eastern Ave. SE, Grand Rapids, MI 49507



- 2/15/2022 @ 10:39:33 EST- Outgoing call to 14699829999
  - Duration- 11 seconds
  - Tower location Address -1615 Eastern Ave. SE, Grand Rapids, MI 49507



- 2/15/2022 @ 12:13:17 EST- Incoming call from 18472742516
  - Duration- 23 seconds
  - Tower location Address -2930 29TH St, Grand Rapids, MI 49512-1748



- 2/15/2022 @ 12:55:08 EST- Incoming call From 19203633095
  - Duration- 11 seconds
  - Tower location Address -14150 Grange Road, Eagle, MI 48906



- 2/15/2022 @ 12:55:14 EST- Outgoing call to 14699829999
  - Duration- 11 seconds
  - Tower location Address -14150 Grange Road, Eagle, MI 48906



- 2/15/2022 @ 13:06:24 EST- Incoming call from 15173159574
  - Duration- 36 seconds
  - Tower location Address -1193 E. Clark Road, Lansing, MI 48906



- 2/15/2022 @ 13:19:18 EST- Incoming call from 15173159574
  - Duration- 146 seconds
  - Tower location Address -1593 Haslett Road, Haslett, MI 49506



- 2/15/2022 @ 14:09:00 EST- Incoming call from 17347724654
  - Duration- 108 seconds
  - Tower location Address -no location data recovered

- 2/15/2022 @ 15:05:36 EST- Incoming call from 18102834807
  - Duration- 11 seconds
  - Tower location Address -2725 Birchcrest Dr SE, Grand Rapids, MI 49506



- 2/15/2022 @ 15:06:08 EST- Outgoing call to 14699829999
  - Duration- 11 seconds
  - Tower location Address -2725 Birchcrest Dr SE, Grand Rapids, MI 49506



  -

- 2/15/2022 @ 15:43:21 EST- Outgoing call to 7342395388
  - Duration- 81 seconds
  - Tower location Address -1615 Eastern Ave. SE, Grand Rapids, MI 49507



- 2/15/2022 @ 16:28:15 EST- Incoming call from 16162072035
  - Duration- 10 seconds
  - Tower location Address -1615 Eastern Ave. SE, Grand Rapids, MI 49507



- 2/15/2022 @ 16:28:20 EST- Outgoing call
  - Duration- 10 seconds
  - Tower location Address -1615 Eastern Ave. SE, Grand Rapids, MI 49507



***839 South Ottillia Street Southeast***

59.     During the review of PASCHAL U.'s Apple iPhone, investigators discovered a Snapchat chat attachment from STEPHAN U. to PASCHAL U. showed it was sent "one week ago."  PASCHAL U.'s phone was placed in airplane mode on February 18, 2022, and therefore not receiving a cellular signal. The attachment could have been from a week prior to February 18, 2022. The Snapchat attachment showed a map with a pin drop. The pin was dropped on 839 South Ottillia Street Southeast, Grand Rapids, Michigan. The pin was labeled "Tj & Dre." A screen shot of the map attachment is shown below:



60.     On February 25, 2022, MTPD Detectives conducted a drive by surveillance of 839

South Ottillia Street Southeast. Detectives noted that the physical location 839 South Ottillia Street

Southeast matched the pin drop location. Detectives observed a Chevrolet Malibu in the driveway

of 839 South Ottillia, bearing Georgia License Plate "GRAND OT." A record check of the Georgia

License Plate revealed the vehicle was registered to DESMON SLEET (SLEET). A record check

of SLEET revealed that SLEET had a Michigan Driver's License with the address 839 South

Ottillia Street Southeast listed on the license. Records checks also revealed that SLEET had a 2008

Kia Optima titled to 839 South Ottillia Street Southeast on August 26, 2020. A check of Kent

County, Michigan Tax Assessor records revealed 839 South Ottillia Street Southeast is owned by Ashley Johnson.

61.     I have reviewed police reports from the Grand Rapids Police Department (GRPD) identifying both to TODD H. and ANDRE DELAFUENTE ((DELAFUENTE). Grand Rapids Police Report #21-048953, from August 11, 2021, documents TODD H. and DELAFUENTE being involved in a traffic stop. The GRPD Officer's narrative states that DELAFUENTE was driving the vehicle involved in the traffic stop and TODD H. was a passenger in the vehicle. The vehicle came to a stop as it pulled into the driveway of "893 S Otillia SE."  The GRPD Officer overheard DELAFUENTE say he noticed police behind him and he was scared of the police, so he tried getting home.

62.     In addition to using bank accounts to conceal the robbery funds, very often the conspirators violate the money laundering statutes by converting the proceeds of their theft into luxury items like watches, jewelry, designer clothing and shoes, fur coats, sunglasses, purses, antiquities, high-end liquor, champagne, and expensive high-powered firearms and associated accessories such as laser sights, magazines and optic scopes. These items are often the fruits of the conspiracy but can also be used as a means to further conceal and transfer the proceeds of the crime among coconspirators.

***Contact with Monica Sparks-Polk, Todd Harris' Mother***

63.     On February 28, 2022, an FBI Agent and MTPD Detective interviewed TODD H.'s mother Monica Sparks-Polk (Sparks-Polk).  Sparks-Polk was shown a still photo of Unsub 1 from the EL Van's security system video footage. Sparks-Polk positively identified Unsub 1 as her son TODD H.  Sparks-Polk was shown EL Van security system video footage which showed Unsub 1 during the robbery.  Sparks-Polk positively identified TODD H. as Unsub 1 in the footage.

64.    Sparks-Polk stated TODD H. was resided with "Desi", Andre, and several others. When asked if Desi was Desmon, Sparks-Polk affirmed.  Sparks-Polk advised she had been to the residence where Desmon and TODD H. were living.

65.    Sparks-Polk advised that she had dropped TODD H. off at Desmond's residence when TODD H. was moving into the residence. Sparks-Polk estimated she dropped TODD H. off at the residence around July of 2021. Sparks-Polk was shown a photograph of 839 South Ottillia Street Southeast and Sparks-Polk advised 839 South Ottillia Street Southeast was the residence she dropped TODD H. off at.  Sparks-Polk believed 839 South Ottillia Street was owned by Desmon's mother. Sparks-Polk knew that the Chevrolet Malibu in the driveway belonged to Desmon.

***Social Media Review by MTPD Detectives***

66.    On March 1, 2022, MTPD Detectives were reviewing information on this case, specifically related to 839 South Ottillia Street Souteast, in regards to attempting to ascertain who lives at the residence and who owns the residence. Detectives used a law enforcement internet-based search tool, as well as Facebook to attempt to make these connections. Detectives were able to locate the following relevant subjects; Desmon Marsean Sleet, Ashley Johnson, Desmyah Sleet. Desmyah Sleet was located on Facebook and through a search of her friends a subject named Dm Sleet was located. The profile picture as well as other pictures associated with this account appear to match the Michigan Driver's license photo for SLEET whose vehicle was located at 839 South Ottillia Street Southeast, Grand Rapids, Michigan. While reviewing posts made by the account "Dm Sleet," investigators observed post from February 12, 2022, in which "Dm Sleet" shared a "memory". The memory was a post by Ashley Wright from February 7, 2017. The post stated the following;

"I don't like my kids…Myah wants to know why I move my head when I type like I'm talking. Des'mon told me to tell Myah that she was a lil Asian baby we found in a dumpster. Where do they get it from??"

67.    In the post "Des'mon" is highlighted in blue indicating that a Facebook user is tagged by that name. When Detectives clicked on the highlighted name "Des'mon" they were redirected to the account "Dm Sleet." In cross referencing names on Facebook with a law enforcement database, MTPD Detectives that a previous name for Ashley Johnson associated with 839 South Ottilia Street Southeast is Ashley Wright. Ashley Wright's Facebook page also contains several posts and tags from a Facebook user named Jenielle Haynes whose name is associated with 839 S Ottilia St SE. Based on other posts referencing their mother it, is believed that Ashley Wright and Jenielle Haynes may be sisters.

## CONCLUSION

68.    Individuals involved in criminal activity often generate substantial amounts of evidence of value to investigators. These items are known and unknown to the subjects of the investigation. Items of evidence known to the subjects such as the clothing, vehicles, weapons, disguises worn during the crime, cellular phones, including, but not limited to smart phones, and digital devices used to communicate and research criminal activity, and other items are often secreted in safe locations to secure the items for the subjects and evade the discovery by law enforcement. Often times the secure location may be the residence of the subjects or residences they consider secure and familiar.

69.    Based on my training and experience, smartphones and other digital technology are one of the primary ways in which individuals interact with each other and discuss criminal activity. Smartphones and other digital devices can save digital information that can be directly and easily transferred to other devices using a cable or via wireless connections such as WiFi or Bluetooth.

Information from smartphones may be stored on removable memory cards or sim cards in the smartphone. These memory cards and sim cards often store large amounts of data and facilitate the transfer of information between devices. Any computer, smartphone, tablet, or other digital device can connect to the internet, and trade information with other devices the user may have access to. The investigation to date, had yielded numerous cellphone communications indicating coordination before and during the crime. In at least instance subjects attempted to delete digital information from their device.

70.     In this case the money stolen was in smaller denominations and bundled by the originating sources. The money was bagged and codified by the original sources of the deposits. The subjects wore hooded sweatshirts as depicted in the above photographs and a jean jacket to cover the firearm. The subjects also used an AR-15 style rifle during the crimes. Criminals often overlook items of clothing such as footwear, guns, sunglasses and do not destroy these items. Law enforcement has sophisticated techniques which can further identity these seemingly innocuous items and associate them with the crime.

71.     In this particular case, over $1,000,000 USD was taken which was in small denomination bills and is unlikely to be destroyed. It would be difficult to spend, destroy, distribute, launder, deposit or consolidate the money in a smaller volume of bills between the date of the robbery and the present time.

72.     I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of SUBJECT OFFENSES may be found in the Property described in Attachment A.

73.     I therefore respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.